**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ANTHONY J, CUTI,<br><br>                    Plaintiff,<br><br>          v.<br><br>OAK HILL CAPITAL PARTNERS,<br>LP, OAK HILL CAPITAL<br>MANAGEMENT PARTNERS, LP,<br>and OHCP DR CO-INVESTORS, LLC<br><br>                    Defendants. | Civil Action No.  17-6706<br><br>**COMPLAINT** |

Plaintiff Anthony J. Cuti, a Florida resident, as his Complaint against

Defendants Oak Hill Capital Partners, LP, Oak Hill Capital Management Partners,

LP, and OHCP DR CO-INVESTORS, LLC (collectively, "Oak Hill" or "Defendants"),

alleges as follows:

**PARTIES**

1.     Plaintiff Anthony J. Cuti, 71, is the former Chairman of the Board,

President, and Chief Executive Officer of Duane Reade, Inc. ("Duane Reade"). He

served in that capacity from 1996 until November 21, 2005.  He resides at 800 S.

Ocean Blvd., Apt. L4, Boca Raton, FL 33432.

2.     Defendant Oak Hill Capital Partners, LP ("OHCP") is an $8 billion

private equity firm formed as a Delaware limited partnership with offices in New

York, Connecticut, and Texas.  In July 2004, Oak Hill and certain of its affiliates acquired Duane Reade in a "going private" transaction. Oak Hill sold Duane Reade to Walgreens in April 2010.

3.     Defendant Oak Hill Capital Management Partners, LP is an affiliate of OHCP, and is likewise formed as a Delaware limited partnership with offices in New York, Connecticut, and Texas.

4.     OHCP DR Co-Investors, LLC is an affiliate of OHCP, and is formed as a Delaware limited liability company. It is a holding company that has no operations and thus no principal place of business.

5.     Non-Party Duane Reade Shareholders, LLC ("DRS") is a Delaware holding company that held a controlling share of the stock in Duane Reade from July 2004 through April 2010. DRS is controlled by its Class A members, which on information and belief are the Defendants. Cuti is a Class B member of DRS.

**JURISDICTION AND VENUE**

6.     This case implicates the Court's diversity jurisdiction. Plaintiff is a citizen of Florida, whereas Defendants are citizens of New York and Delaware. The amount in controversy exceeds the $75,000 jurisdictional minimum. This Court therefore has jurisdiction under 28 U.S.C. § 1332.

7.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because at least one defendant resides in this district and a substantial part of the conduct giving rise to the claim occurred in this district.

## FACTS COMMON TO ALL COUNTS

### Anthony Cuti Turns Duane Reade into a New York Icon

8.     In early 1996, Cuti was recruited by Bain Capital ("Bain"), then-owner of Duane Reade, to become Duane Reade's Chairman, President, and CEO. At the time, Duane Reade had just 59 stores, with annual sales of $320 million, EBITDA[1] of $20 million, and a fair market value of *negative* $20 million.

9.     After little more than a year under Cuti's stewardship, Duane Reade had already experienced a dramatic turn-around from the brink of bankruptcy. In June 1997, Duane Reade's management (led by Cuti) and the investment bank Donaldson, Lufkin & Jenrette ("DLJ") (through a team led by investment banker Andrew Nathanson) purchased Duane Reade from Bain for $90 million plus $260 million of debt, yielding Bain a gain of $74 million on their $16 million investment. Cuti rolled over 100% of his earned equity gain (over $4 million) into the transaction. Mr. Nathanson became a director of Duane Reade in 1997.

10.     In or about July 1997, in connection with DLJ's acquisition, Cuti and Duane Reade entered into a five-year employment agreement (the "1997 Agreement").

11.     In February 1998, Duane Reade "went public" with an Initial Public Offering ("IPO"), which brought DLJ's $90 million equity investment to a valuation

---

[1] EBITDA stands for Earnings Before Interest, Taxes, Depreciation, and Amortization, and it is a non-GAAP (Generally Accepted Accounting Principles) metric considered by some to be more useful for valuing a company than net earnings, which are determined based on GAAP, particularly when the company is highly-leveraged.

of more than $180 million ($16.50 per share). Once again, Cuti rolled his earned gains (this time, approximately $10 million) into the Company.

12.     Shortly thereafter, Cuti announced and implemented a growth plan that resulted in the addition of 61 stores in 1998 alone, and another 21 to 28 more stores (net of closed stores) in each following year through 2002.  Cuti's aggressive expansive campaign changed the retail landscape in New York City, and made Duane Reade New York's signature drugstore.

13.     Over the four years following the IPO, DLJ divested most of its Duane Reade equity in public stock sales, yielding DLJ and its partners (including Mr. Nathanson) over $360 million, or over four times their original investment ($90 million of original equity, comprising $78 million DLJ equity and $12 million management equity).

14.     Duane Reade had the highest sales per square foot and the highest growth rate in the industry from 1997 through 2002.  Indeed, during Cuti's tenure, Duane Reade's sales increased from $300 million to $1.6 billion.  Duane Reade also became the only regional chain to achieve the No. 1 market share in the industry's No. 1 market.

15.     The events of September 11, 2001 severely weakened Duane Reade's performance, destroying its most-profitable store and forcing the temporary closure of over a dozen others.  Nevertheless, Duane Reade's earnings significantly surpassed the maximum target levels specified in the 1997 Agreement, entitling Cuti to a $1.5 million bonus.  None of Cuti's subordinates earned bonuses, however, so Cuti declined

to accept the bonus at the time.  Instead, he asked that his bonus be deferred until the Company's insurance claim for the losses was resolved—at which point all of management would receive their lost bonuses.  Even though Duane Reade received approximately $9.9 million in insurance proceeds in the Second Quarter of 2002, Cuti did not seek payment of the deferred bonus at the time.  Instead, he insisted on spending the proceeds primarily on marketing in an effort to bring more of the City's economically weary residents back into stores.

16.    In 2002, as Cuti's initial contract was about to expire, Cuti expressed his desire to leave the Company and to accept an offer to become CEO of a national drugstore chain. Duane Reade's Board convinced Cuti to remain at Duane Reade. The Board emphasized that, in the difficult aftermath of 9/11, Duane Reade needed Cuti's continued leadership to sustain what he had spent the last six years building.

17.    Cuti and Duane Reade entered into a new employment agreement dated July 31, 2002 (the "2002 Agreement"), which provided more lucrative terms to Cuti than his prior contract.

18.    Although Cuti agreed to stay at Duane Reade, he did not agree to another five-year contract. Instead, the 2002 Agreement provided that it expired at the end of 2004. And if Cuti was still at Duane Reade by the end of 2004, the Company had to pay him over $20 million at that time, and if it wanted to keep Cuti beyond 2004, it had to provide Cuti with more lucrative terms than the 2002 Agreement.

### Duane Reade's Board Decides to Sell Duane Reade to Oak Hill

19.     In the Fourth Quarter of 2002, Duane Reade's Board of Directors began thinking of strategic alternatives in view of the weak New York economy, the changing platform for the retail pharmacy industry (e.g., lower reimbursements in connection with state and federal Medicaid and Medicare, and the growing mail order business), and labor union difficulties.

20.     Thus, in or about the First Quarter of 2003, and under the guidance of the investment banker Bear, Steams & Co. Inc. ("Bear Stearns"), Duane Reade began preliminary discussions with a number of private equity investors to determine their level of interest in purchasing the company.

21.     In or around that time, Cuti sought the advice of Andrew Nathanson, whom Cuti had known since 1997 because Nathanson was on Duane Reade's Board from 1997 to 2000. At the time, Nathanson was a partner at Oak Hill—regarding management's handling of the potential transaction.   During a lunch meeting between Cuti and Nathanson in about the Second Quarter of 2003, Nathanson requested permission for Oak Hill to be considered as a potential buyer.  Cuti directed Nathanson to Bear Stearns, which approved of Oak Hill's involvement, and Oak Hill joined the discussions.

22.     Oak Hill conducted extensive due diligence on Duane Reade, including a comprehensive audit of Duane Reade's books by accounting firm KPMG, LLP.

23.     In December 2003, Duane Reade announced that it had reached a deal with Oak Hill to take Duane Reade private at $17.00 per share.

6

24.     On July 30, 2004, the acquisition closed at a reduced purchase price of $16.50 per share.

## Cuti Invests in Duane Reade Alongside Oak Hill

25.     The prospect of partnering with Nathanson and Oak Hill to buy Duane Reade was sufficiently enticing that Cuti agreed to renegotiate the 2002 Agreement.

26.     Cuti and Oak Hill, through their counsel, engaged in lengthy negotiations over a new contract and several ancillary contracts that together would govern how Cuti's investment interest in Duane Reade would be calculated.

27.     A new contract was finalized in March 2004 and made effective as of the date the acquisition was completed, July 30, 2004 (the "2004 Agreement").

28.     Cuti agreed to relinquish the payments due at the 2004 and a number of other benefits in exchange for, *inter alia*, a "Profits Interest" in the acquisition.

29.     According to § 8(a)(i) of the 2004 Agreement, the Profits Interest "shall entitle [Cuti] to an allocation of the first $20 million in appreciation in the value of [DRS] above V, where V equals the fair market value of the aggregate capital contributions made by [Oak Hill] on the Effective Date for their equity holdings in [DRS]; and (B) which shall entitle [Cuti], after his allocation of the amount described in clause (A), to share pro rata with other equity holders of [DRS] in any additional appreciation in accordance with the formula [X + (V + X)], where X equals $20,000,000."

30.    In short, based on the amount Oak Hill ended up investing in Duane Reade, Cuti was entitled to the first $20 million in profits plus 7.4% of the profits thereafter.

31.    An important adjunct to the 2004 Agreement was a Preemptive Rights Agreement ("PRA"), which was made effective as of the acquisition date, July 30, 2004, and provided protections for Cuti's and other Duane Reade officers' investments.

32.    A true and correct copy of the Preemptive Rights Agreement, dated as of July 30, 2004, is annexed hereto as Exhibit "A."

33.    PRA § 2.2 provided that Oak Hill could not cause Duane Reade to issue securities to Oak Hill or any of its affiliates unless three steps were taken:

   a.  Review the available financing alternatives and the cost effectiveness thereof with a nationally recognized investment bank selected by DRS (which was controlled by OHCP);

   b.  Determine, based on the reasonable judgment of the Board of Directors (and in consultation with Cuti), that the securities are the most favorable source of financing readily available to Duane Reade, taking into account the needs of the Company, the facts and circumstances as of such time and the likely terms of alternative financing; and

   c.  Obtain, at Duane Reade's expense, an opinion from a nationally recognized investment bank that the securities are fair, from a financial point of view, to Duane Reade (i.e., a fairness opinion).

8

34.    According to the Amended and Restated Operating Agreement for Duane Reade Shareholders, LLC (the "LLC Agreement"), Cuti's Profits Interest was converted to Class B membership units in DRS. Like the Profits Interest, these were subordinate to Oak Hill's investment but entitled Cuti to the first $20 million of proceeds if and when the value of DRS exceeded the amount of capital Oak Hill had invested in it.

### Post-Acquisition Disputes Between Cuti and Oak Hill

35.    After the deal for Oak Hill to buy Duane Reade was complete, Oak Hill decided to scrap plans to continue to grow the chain of drugstores, much to Cuti's chagrin. In addition, despite occupying every seat on Duane Reade's board of directors (other than Cuti's), Oak Hill appointed three of its own people as unnecessary and unsalaried officers of Duane Reade (each was a "Vice President") so that they could interfere in Cuti's operational management of Duane Reade in ways that mere directors could not.

36.    After over a year of acrimonious relations between Cuti and Oak Hill, Oak Hill caused Duane Reade to terminate Cuti's employment without cause. Cuti's replacement was announced the same day.

37.    Even though Cuti's replacement as CEO was far less knowledgeable about the business, Oak Hill eliminated the three new Vice President posts it had created to frustrate Cuti's management.

38.    On September 1, 2006, Cuti filed a AAA employment arbitration claim against Duane Reade and DRS.

39.    From November 2006 through May 2007, Oak Hill conducted a series of "internal investigation" that Duane Reade's outside auditor called "digging for dirt" for Duane Reade and DRS to use against Cuti in the arbitration.

40.    Duane Reade and DRS used the internal investigation findings to assert counterclaims for fraud and breach of contract against Cuti in the arbitration.

41.    Ultimately, Oak Hill convinced federal prosecutors and the SEC to bring charges against Cuti for securities fraud. Oak Hill claimed that it had lost over $100 million as a result of supposedly inflated income reported by Duane Reade while the Company was public.

42.    Cuti was convicted, after a nine-week jury trial, from April 6 to June 8, 2010.

43.    Despite being convicted of a crime where the only alleged victim was Oak Hill, the presiding judge ultimately found that Oak Hill was not a victim—no one lost any money as a result of the conduct underlying the conviction.

44.    The conviction was affirmed and Cuti served his modest prison sentence and his period of supervised release. Although the government never requested a fine be imposed, the judge inexplicably imposed a $5 million fine. Other financial aspects of the sentence are still being challenged in the courts, currently on appeal to the Second Circuit.

45.    After Cuti's supervised release period was over in December 2016, during a recent arbitration against Duane Reade and DRS, Cuti learned of

previously-concealed facts that could have helped him avoid conviction in the first place, or helped him vacate that conviction if he were still in custody.

46.     For instance, a key government witness was given a seven-figure payout *during* the middle of Cuti's trial. He apparently sought the payment before he testified at the trial, but the payment was only sent after he finished testifying-- just days after, in fact. Oak Hill funneled that payout through DRS, thereby concealing it from public scrutiny.

### Oak Hill Dilutes Cuti's Investment by Causing Duane Reade to Issue $125 Million of Egregiously Expensive Preferred Stock to Oak Hill

47.     Oak Hill engaged in a variety of misconduct that diminished the value of DRS and thus Cuti's Profits Interest/Class B membership units.

48.     In January 2009, Duane Reade informed Cuti that it intended to sell $100 million of preferred stock and that it expected that stock to be purchased by affiliates of Oak Hill.

49.     Such a potential sale triggered the protections of the PRA, including the three requirements of § 2.2.

50.     After a consultation call in January 2009, Cuti did not hear more about the potential transaction until July 2009.

51.     In July 2009, Duane Reade, through its and Oak Hill's shared attorneys, sent Cuti revised terms for a preferred stock transaction (the "2009 Preferred Stock Issue"). It was then 25% larger in terms of the investment size: $125 million instead

11

of $100 million. But it was much more than 25% more expensive and dilutive to existing investors in Duane Reade, including Cuti.

52.     Among the most egregious provisions was that the 2009 Preferred Stock Issue included a guarantee that the purchasers (Oak Hill and its affiliates) would receive at least double their money back, no matter how much time had passed.

53.     In obtaining a fairness opinion, as required by the PRA, Oak Hill told the investment bank that it would not sell Duane Reade before December 31, 2012. And this formed an important assumption in the investment bank's fairness opinion.

54.     The investment bank's fairness opinion was given to Cuti by Oak Hill in connection with other provisions of the PRA which gave Cuti the right to participate alongside Oak Hill in the purchase of the 2009 Preferred Stock Issue.

55.     On information and belief, without the assumption that there would not be a sale until December 31, 2012, the investment bank would have concluded that the terms of the 2009 Preferred Stock Issue were unfair to Duane Reade.

56.     In fact, Oak Hill was at that time actively discussing selling Duane Reade to a national drugstore chain, Walgreens.

57.     During a consultation call with Cuti on July 24, 2009, Oak Hill failed to disclose that Walgreens had told Oak Hill that it was "very interested" in acquiring Duane Reade. Far from it, Oak Hill falsely represented that it had conveyed all of the same information to Cuti that had been disclosed to the other investors—this was untrue because Oak Hill was the primary investor, and Cuti certainly did not have the same information as Oak Hill.

58.     Throughout July and August 2009, Cuti was residing in Saddle River, New Jersey. In addition, Cuti was frequently working in New York City, where he regularly met with his lawyers in connection with pending cases against him. At the time of the July 24, 2009 call, Cuti was at the offices of Greenberg Traurig at 200 Park Avenue, New York, New York. Cuti also met with lawyers at Greenberg Traurig's New York offices on several occasions in August 2009 when evaluating the 2009 Preferred Stock Issue, and when ultimately deciding to authorize his attorneys to tell Duane Reade's lawyers that he would not participate in the 2009 Preferred Stock Issue.

59.     Prior to the 2009 Preferred Stock Issue closing on August 7, 2009, Walgreens communicated its valuation of Duane Reade to Oak Hill.

60.     Oak Hill did not disclose Walgreens' valuation to the investment bank that provided a fairness opinion or to Cuti.

61.     On information and belief, Oak Hill even concealed Walgreens' valuation from Duane Reade's management, including other members of Duane Reade's board.

62.     On information and belief, Oak Hill concealed Walgreens' valuation from Andy Nathanson, even though he was a member of the Management Committee of DRS.

63.     Thus, by concealing this information from the full boards or management committees of all of the other entities that were parties to the PRA— Duane Reade Inc., Duane Reade Holdings, Inc.; and Duane Reade Shareholders,

LLC—and from all of the individual parties to the PRA, Defendants prevented the requirements of the PRA from being met and concealed that fact from the other parties to the PRA.

64.     As a result, an unfairly expensive and dilutive securities offering—the 2009 Preferred Stock Issue—proceeded when it should not have.

**Walgreens Bought Duane Reade for Over $1.075 Billion in 2010**

65.     In February 2010, it was announced that Walgreens and Oak Hill had reached an agreement for Walgreens to buy Duane Reade for approximately $1.075 billion.

66.     At that valuation, the profits realized by Oak Hill were over $200 million.

67.     As a result of the 2009 Preferred Stock Issue, the overwhelming majority of the profits from the Walgreens deal went to other Oak Hill entities besides DRS.

68.     DRS ended up receiving only about $13 million in profit after payments of the amounts due on the 2009 Preferred Stock Issue, as well as a less-expensive but still dilutive 2007 preferred stock issue.

69.     None of the profit received by DRS was paid to Cuti, however, as Oak Hill decided to create a $28 million "reserve" to pay potential liabilities. Virtually all of that reserve was then spent on Duane Reade's lawyers in an effort to prevent Cuti from getting any of his investment bank.

**Arbitration Proceedings against Oak Hill Were Stayed**

70.     On February 10, 2015, Cuti filed a Second Amended Statement of Claim and Demand for Arbitration against Duane Reade, Inc., Duane Reade Holdings, Inc., and Duane Reade Shareholders, LLC. The pleading also attempted to add Oak Hill Capital Partners, LP, as a Respondent.

71.     On February 18, 2015, the Second Amended Statement of Claim and Demand for Arbitration was served on Oak Hill Capital Partners, LP.

72.     On March 5, 2015, attorneys for Oak Hill filed a petition to stay the arbitration proceedings as to Oak Hill Capital Partners, LP, in New York State Supreme Court. Cuti opposed the petition.

73.     On October 2, 2015, the stay petition was granted by the Supreme Court.

74.     Cuti timely appealed the Supreme Court's stay decision to the Supreme Court Appellate Division, First Department.

75.     On March 15, 2017, the First Department affirmed the stay order.

76.     Oak Hill docketed the First Department's decision with the Supreme Court by filing a Notice of Entry.

77.     CPLR 204(b) "tolls the applicable period of limitation between the time a demand for arbitration is made and a final determination that the dispute is not the proper subject of arbitration." *Francese, Inc. v. Troy School*, 95 N.Y.2d 59, 61 (2000) (holding that the "final determination" occurs when the Appellate Division affirms the trial court's decision).

## Count 1 - Breach of Contract

34.     Plaintiff realleges the above paragraphs as if fully stated herein.

35.     This Count 1 states a claim for breach of contract against all Defendants based on the Preemptive Rights Agreement ("PRA").

36.     A claim for breach of contract can arise either from breach of an express term in the contract or from breach of the implied covenant of good faith and fair dealing. Both bases for a breach of contract claim are asserted herein.

37.     Even if Defendants' conduct did not violate an express term of the PRA, it effectively denied Plaintiff the express benefits provided by the PRA, and therefore violated the implied covenant of good faith and fair dealing.

38.     Cuti substantially performed all of his obligations under the PRA.

39.     The Preemptive Right Agreement's Sections 2.1 and 2.2 provided procedural safeguards against dilution of Tony Cuti's and other members of management's equity and equity-based interests in Duane Reade.

40.     As noted above, PRA § 2.2 required three things be done before any securities were issued by Duane Reade, Inc., Duane Reade Holdings, Inc., or DRS:

        a.  A review of alternatives with an investment bank;

        b.  A determination in the reasoned judgment of the Board that the securities are the most favorable form of financing available; and

        c.  A fairness opinion.

41.     Although Duane Reade spoke with an investment bank about its alternatives in a contemporaneous refinancing of its debt securities, neither Duane

Reade nor its board reviewed any alternatives to the Preferred Stock Issue with any nationally recognized investment bank.

42.    PRA Section 2.2(b) required the Board of Duane Reade to exercise its reasoned judgment when approving any securities offering to any Oak Hill affiliates.

43.    Oak Hill, through its agents Tyler Wolfram and others, made a secret promise to Duane Reade's senior management (including CEO and board member John Lederer) to corrupt their judgment with respect to the Preferred Stock Issue.

44.    Oak Hill's promise to Duane Reade's senior management was not disclosed to Cuti, even though he was contractually entitled to consult on with the board on the transaction, nor was it disclosed to the investment bank preparing the fairness opinion.

45.    Oak Hill also failed to disclose important valuation information to the investment bank preparing the fairness opinion. As a result, the fairness opinion

46.    Oak Hill failed to tell the investment bank that it was at the time of the Preferred Stock Issue actively considering selling Duane Reade to Walgreens within the near future. Far from so disclosing, Oak Hill falsely represented to the investment bank that it would not sell Duane Reade before the end of 2012 at the earliest.

47.    As a result of Oak Hill's false representation to the investment bank, the fairness opinion that was issued was based on the intentionally false assumption that there would not be any sale of Duane Reade before December 31, 2012, at the earliest.

48.     By its actions, Oak Hill breached PRA § 2.2 by causing Duane Reade to issue securities to Oak Hill without satisfying any of the three steps required, even though all three were necessary to permit a valid issuance of securities to Oak Hill or its affiliates.

49.     Based on expert analysis that has already been performed, but for OHCP's misconduct, Cuti's Class B units would have been worth at least $21.9 million. Instead, OHCP funneled the profits from the Walgreens deal to itself and its other affiliates (ones in which Cuti had no stake).

50.     Accordingly, Defendants are liable to Cuti for causing securities to issue in breach of the PRA, and Cuti is entitled to damages consistent with his expectations, in an amount not less than $21.9 million plus statutory interest through the date of judgment, which is currently more than $12 million, for a total damages award of over $34 million.

51.     Alternatively, Defendants' breaching conduct warrants restitution damages, divesting them of their improper profits from the 2009 Preferred Stock Issue, regardless of whether those profits were derived directly or indirectly.

## Count 2 – Fraudulent Concealment

52.     Plaintiff realleges the above paragraphs as if fully stated herein.

53.     Oak Hill had a duty to disclose material information to Cuti and others concerning the 2009 Preferred Stock Issue.

54.     Among other things, it was a necessarily implied obligation under the PRA that Oak Hill had to provide all material information to Cuti concerning the transaction.

55.     Under PRA § 2.2(b), Cuti had the right and the obligation to consult with the issuing party's board of directors about the transaction.

56.     Cuti's consultation right was rendered meaningless and ineffective by Oak Hill's concealment of the facts affecting the valuation of Duane Reade.

57.     Under PRA §§ 2.3, 2.4, and 2.5, Cuti had a right to participate in the 2009 Preferred Stock Issue and to receive certain information in order to decide whether to do so.

58.     Oak Hill concealed material information from Cuti, including the valuation information received from Walgreens and the facts concerning the promise made to Duane Reade management, even though Oak Hill had a duty to disclose this information to him in order for him to decide whether to participate in the 2009 Preferred Stock Issue.

59.     Oak Hill's concealment was intentional and for the purpose of discouraging Cuti from participating in the Preferred Stock Issue.

60.     Cuti relied on the concealment to his detriment, because he elected not to participate in the 2009 Preferred Stock Issue.

61.     Cuti's reliance was reasonable and justified under the circumstances, because despite the distrust between the parties, it seemed unlikely that Oak Hill

would itself commit securities fraud while it was simultaneously claiming to be the victim of securities fraud.

62.     To the extent that any Defendants did not complete all elements of fraudulent concealment on their own, they are nonetheless liable based on *respondeat superior* from the actions of their agents, and those agents' participation in a civil conspiracy with each other and others.

63.     Because the most-egregious concealed fact was only discovered a few months ago, on January 30, 2017, substantial time remains before the statute of limitations runs, thus enabling Cuti to use the discovery available in this action to ascertain the identities of other participants in this conspiracy to commit fraudulent concealment.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

      a.      Compensatory damages;

      b.      Punitive damages;

      c.      Pre-judgment interest at the New York statutory rate of nine percent (9%);

      d.      Post-judgment interest;

      e.      An award of attorney's fees and costs; and

      f.      Such other and further relief as the Court deems just and proper.

Dated: September 1, 2017

/s Brian C. Brook

_____

Brian C. Brook (BB 1980)
CLINTON BROOK & PEED
641 Lexington Avenue, 13th Floor
New York, New York 10022
Telephone: (212) 328-9559
Facsimile: (212) 328-9560
Brian@ClintonBrook.com

*Attorneys for Plaintiff Anthony J. Cuti*